**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE F. MCGOVERN** | ) | **CASE NO**. **1:13 CV 2460** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **JUDGE JOHN R. ADAMS** |
| | ) | |
| **FIRST HOUSING DEVELOPMENT** | ) | |
| **CORPORATION OF FLORIDA**, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| **Defendant.** | ) | (Resolving Doc. 18) |

This matter is before the Court on Defendant First Housing Development Corporation of America ("First Housing") motion for summary judgment. For the reasons that follow, First Housing's motion (Doc. 18) is GRANTED in PART and DENIED in PART.

**I.    FACTS**

First Housing is a lender, and offers additional services and financial products intended to facilitate multifamily residential construction projects. First Housing is a Florida Corporation with a principal place of business in Tampa, Florida, and operations nationwide. Plaintiff George F. McGovern ("McGovern") began employment with First Housing as a loan originator on December 1, 2010. McGovern was employed by First Housing as the "Director of FHA Originations – Midwest." McGovern is a resident of Cuyahoga County.

First Housing, through Edward Busansky, extended an offer of at will employment to McGovern via letter dated October 26, 2010 ("Offer Letter"). The letter included the following terms of compensation, which the parties do not dispute:

BASE SALARY:      $75,000 annually

COMMISSION PLAN:      Quarterly payout upon achievement of $225,000 annual threshold in origination fees, and/or trade premiums generated through sale or placement of loans originated by you; Commissions [sic] to be paid on the following scale:

| | |
|---|---|
| $.00 - $225,000 | 0% |
| $225,001 - $450,000 | 20% |
| $450,001 - $650,000 | 30% |
| $650,001(+) | 40% |
| Trade Premiums | 20%, up to $200,000 |

In addition to base salary and commissions the offer also provided reimbursement for office operating expenses and travel "subject to review." (Motion for Summary Judgment, Exhibit A.) Prior to accepting the offer of employment, McGovern negotiated with Busansky to increase his monthly reimbursement for office expenses from $600 to $650 and to include "related" expenses within the $1,000 travel reimbursement figure. McGovern also negotiated two exceptions to the Commission Plan for specific projects in Midtown Detroit – Woodward Garden Apartments and Sugar Hill Apartments/74 Garfield Apartments. McGovern drafted the amendment to the offer in the form of a Memorandum dated November 10, 2010 ("Memorandum"), the amended language provides:

The Commission Plan as you proposed applies to all deals I originate except for the following project financings.

- Woodward Garden Apartments, Midtown Detroit, Michigan (about $8.5 million, FHA 220 mortgage)

- Sugar Hill Apartments/74 Garfield Apartments, Midtown Detroit, Michigan (about $6 million, FHA 220/221d mortgage)

- Commission. For these two financings George McGovern's commission will begin at the $225,001 - $450,000/20% Commission Plan level. His commission for such deals will be based upon the gross amount of origination fees, including any consultant fees, and premium earned

2

> through the sale of GNMA[1] securities for the transaction less any salary, office expense, travel expense, and revenue paid to Forest City Capital Corporation as of the date of settlement.
>
> In the instance where both financings (or other financings) close in the same fiscal year, the commission calculation will escalate from the 20% level as is normally the case under First Housing Commission Plan.

The negotiated exception differs from the original Commission Plan in three respects: the threshold for commission, the revenue streams used to generate commission, and by specifying the deductions taken when calculating commission. The Commission Plan included in the Offer Letter is silent as to the calculation of commission, it merely states threshold levels for commission percentages. The amendment differs from the original plan by specifically stating how commission is to be calculated and by allowing commission on the first dollar earned for the named projects. The parties agree that McGovern's at-will employment began with these terms of compensation after he signed the offer letter on November 10, 2010. The Offer Letter, by its own terms, contained "salient components," and referenced company policy and an attached summary chart that prescribed 401k, paid time off and other benefits for which McGovern was eligible. Neither party has produced or referred to these documents in this matter. The Offer Letter was subject to specific amendments reflected in the Memorandum. According to First Housing, these two documents are the entirety of the terms of compensation under which McGovern began his employment on December 1, 2010. (Busansky Declaration, ¶ 9.)

McGovern did not close Woodward, Sugar Hill, or any other financing deal during his first year of employment by First Housing. It is undisputed that he received his base salary and reimbursements pursuant to the terms of the compensation agreement in 2011. In 2012 McGovern closed five financing projects:

---

[1] GinnieMae or "Government National Mortgage Association" Guaranteed Securities issued to secure the financing of an FHA insured project.

     (1)  Bridlewood Village Apartments – 4/24/12

     (2) Woodward Garden Apartments – 5/8/12

     (3) Woodruff Village Apartments – 7/12/12

     (4) Luther Hills Apartments – 7/19/12

     (5) Luther Woods Apartments – 7/19/12

According to First Housing, McGovern was paid commission in June and in September of 2012.

McGovern's commissions were calculated by his supervisor Edward Busansky, who explains:

> It is custom and practice in the industry to deduct attorney fees from placement and origination fees when calculating the commission earned by a loan originator. In determining the amount eligible for commission the following formula is used in the industry: (origination fees + (placement fees – legal fees) – expenses.
> * * *
> The formula I used to calculate McGovern's commission on aggregate fees in 2012 was: ((origination fees) + (placement fees – legal fees) – expenses)) x applicable percentage = commission. The total generated origination fees were $224,017. Placement fees less legal fees were $79,785 ($162, 285 - $82,500). The total expenses including for any salary, office travel expenses [($135,345)] and a broker's fee of $22,938 for a total of $158,287[2]. The amount of commission paid was $29,103 (20% x $145,515).

(Busansky Declaration, paras. 6 & 11.) In addition to commission on the placement and origination fees, under the compensation agreement, McGovern receives a fixed 20% commission on the "trade premiums" generated through the issue and sale of GNMA guaranteed securities to support the financing of each project. According to Busansky, McGovern was compensated $60,030 in 2012, which reflects approximately 20% of $300,149.33[3] in GNMA premiums. McGovern does not dispute that he was paid $29,103 in commissions on fees and $60,030 for trade premiums, for a total commission of $89,133 in 2012, he alleges that the

---

[2] The arithmetic in the Bunsansky Declaration contains a small error (135,345 + 22,938 = 158,283 not 158,287); if the error is corrected, the resulting 20% commission is $29,103.80 not $29,103.00.
[3] The arithmetic in this instance rounds up to $60,030 from $60,029.86.

compensation paid by First Housing does not reflect the full amount owed him under the Commission Plan as amended by his Memorandum.

McGovern's objections to the calculation of his commission began with the first quarter he was entitled to commission. First Housing has produced a series of emails between McGovern and his supervisor, Busansky, which reflect McGovern's inquiries into and disagreements with the numbers used by Busansky to calculate his commissions. (Defendant's Motion for Summary Judgment, Exhibits H–P.)  The emails appear to have resulted in some changes to the calculations – fee totals were updated for Woodward Garden, the amount legal fees was reduced – other deductions (such as those for travel) remained the same. These exchanges continue into October 2012.  The next email included by Defendant is a November 8, 2012 "pipeline update" in which McGovern identifies six construction projects and an upcoming conference as his agenda remaining for the end of 2012 and early 2013. McGovern identifies Luther Haus as a financing possibly closing in December 2012 and Mayslake as ongoing, he references Amherst, Addison Apartments, Prairie Apartments, and Nailah Apartments all at various stages.

McGovern's next email requests a conversation with Busansky which is followed by a December 7, 2012 email from McGovern proposing to change his employment status from salaried, full-time, employee, to a fee-based consultant. McGovern cites concerns over continuity in the handling of the Mayslake, Luther Haus, and Woodward Garden projects as the motivating force, and proposes that he continue to work those projects only on a fee basis. Attached to the email is a document titled "executed letter to Ed Busansky re resignation.12.7.2012.pdf." (Motion for Summary Judgment, Exhibit Q.) The attached letter details his proposal concerning the three projects, with a commission of 25% on overall compensation earned by First Housing net of any "Lender legal costs customarily incurred" to be paid two weeks after the settlement of

5

securities for trade premiums and two weeks after initial endorsement for financing and placement fees.  He proposes that the commission be calculated from the first net dollar earned, without a threshold. Busansky replied on December 11, 2012, accepting McGovern's resignation as of December 7, 2012, and included terms of the resignation, stating "[a]s discussed, we will pay your cell phone and office rent through the end of December.  Your salary will be stopped on 12/15/2012."  (Summary Judgment, Exhibit R.) Busansky continued to reject the fee based consulting arrangement proposed by McGovern, and instead stated that McGovern would be paid commission pursuant to the original Commission Plan, with the same threshold schedule, for the Mayslake, Amherst, and Luther Haus projects; remaining premium income for Woodward Garden was conditioned on the completion of construction by 12/31/13, all payments on a quarterly basis, ending 12/31/13, First Housing would retain any income earned after 12/31/13.

On December 13, 2012, McGovern rejected the terms communicated by Busansky and responded with a counter offer, proposing commission at the 20% rate, removing restrictions on Woodward Garden premiums, and reducing the threshold for commission to $75,000. Busansky did not respond directly to this proposal in the materials produced, however, a signed letter dated December 19, 2012 reiterates First Housing's acceptance of McGovern's resignation "without conditions." (Summary Judgment, Exhibit W.)  The letter continues:

> [y]ou have offered to continue in an advisory capacity and we provided terms that would be acceptable to First Housing.  You have indicated that these terms are not acceptable.  You have further tried to make contact with our customers and undermine our relationships. This must end immediately.  We wish you the best of luck in your future endeavors.

(Motion for Summary Judgment, Exhibit W.)  Neither party, in seeking summary judgment or responding to the motion, has provided any document or other evidence indicating that

McGovern and First Housing reached an agreement for the payment of commission for projects that closed or income generated after McGovern left First Housing's employ.

McGovern filed suit disputing the amount of commission paid in 2012 and claiming additional compensation should be provided for financing contracts that closed after he left First Housing. McGovern asserts five causes of action in his Complaint: 1) breach of contract for failing to pay in full commissions owed in 2012; 2) Promissory Estoppel, again for failure to pay the full amount of commission owed under the compensation agreement; 3) Quasi-Contract, restating claims one and two, for unpaid commission in 2012; and 4) Unjust Enrichment which overlaps with counts one through three with regard to commission during his employment, but also claims continuing commission is due on all projects he was involved in while employed by First Housing, including those that closed after he resigned; McGovern also seeks 5) Declaratory Judgment determining the legal rights of the parties to future income generated by the "Mayslake Center II Apartments" project.

## II.  LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010). A fact must be essential to the outcome of a lawsuit to be 'material.' *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986). Summary judgment will be entered when a party fails to make a "showing sufficient to establish…an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23. "Mere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden." *Bell v. Ohio State Univ*., 351 F.3d 240, 253 (6th Cir. 2003).

7

Summary judgment creates a burden-shifting framework. See *Anderson*, 477 U.S. 250. The moving party has the initial burden of showing there is no genuine issue of material fact. *Plant v. Morton Int'l, Inc*., 212 F.3d 929, 934 (6th Cir. 2000). Specifically,

> "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1).

The burden then shifts to the nonmoving party to prove that there is an issue of material fact that can be tried. *Plant,* 212 F.3d at 934. If this burden is not met, the moving party is then entitled to a judgment as a matter of law. *Bell*, 351 F.3d at 253. When evaluating a motion for summary judgment, the Court construes the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1996). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 248 (1986).

### III.   ANALYSIS

#### a) Breach of Contract

McGovern alleges breach of contract stating that First Housing has paid less than the amount owed him in commission for 2012. McGovern contends that he is not required to specify the exact amount he was underpaid, he nevertheless states that he was underpaid commission by $33,734.00 in 2012.[4] According to McGovern's deposition testimony, he reached this number by reducing the expenses deducted by First Housing; including consulting fees from the Mayslake project; increasing the commission percentage from 20% to 30% for the Bridlewood Apartment Project; and increasing the percentage again to 40% for the Woodruff Village, Luther Hills, and Luther Woods projects. First Housing maintains that McGovern was properly compensated under the terms of the Offer Letter and Memorandum and that, in addition the other manipulations, McGovern failed to account for legal fees associated with the Woodward Garden, Luther Hills, and Luther Woods projects.

Because this matter was removed pursuant to this Court's diversity jurisdiction, state law governs the substantive issues and federal law governs the procedural issues. *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425–26 (6th Cir. 2009). "Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012), citing *Savedoff v. Access Grp., Inc.,* 524 F.3d 754, 762 (6th Cir.2008) (applying Ohio law) *inter alia*. The interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court. *Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854,

---

[4] This number reflects the totals provided in McGovern's opposition to summary judgment, which alleges underpayment of $10,029.00 in June 2012 and underpayment of $23, 705.00 in September 2012.

858 (6th Cir.1993) (applying Ohio law). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 474 N.E.2d 271, 272–73 (1984).

"The role of courts in examining contracts is to ascertain the intent of the parties." *City of St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 875 N.E.2d 561, 566 (2007). "The intent of the parties is presumed to reside in the language they choose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996); *accord State ex. rel Petro v. R.J. Reynolds Tobacco Co.*, 104 Ohio St.3d 559, 820 N.E.2d 910, 915 (2004). "Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *City of St. Marys*, 875 N.E.2d at 566. "[W]here the terms in an existing contract are clear and unambiguous, this court cannot . . . create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, 150 (1978)). Extrinsic evidence is admissible "to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham*, 667 N.E.2d at 952; *accord R.J. Reynolds*, 820 N.E.2d at 915. Nevertheless, a court "is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties" in the terms of their written contract. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261–62 (2003).

Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable

interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 784 N.E.2d 186, 190 (2003). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Id.* at 190. In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri–State Group, Inc. v. Ohio Edison Co.*, 151 Ohio App.3d 1, 782 N.E.2d 1240, 1246 (2002) (quoting *Equitable Life Ins. Co. of Iowa v. Gerwick*, 50 Ohio App. 277, 197 N.E. 923, 926 (1934)), so as "to give reasonable effect to every provision in the agreement." *Stone v. Nat'l City Bank*, 106 Ohio App.3d 212, 665 N.E.2d 746, 752 (1995). "The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." *Burris v. Grange Mut. Co.*, 46 Ohio St.3d 84, 545 N.E.2d 83, 88 (1989) (quoting *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 462 N.E.2d 403, 406 (1984)). "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander*, 374 N.E.2d at 150. If the language in the contract is ambiguous, the court should generally construe it against the drafter. *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 798 (6th Cir.2003) (applying Ohio law).

Initially, First Housing averred that the offer letter and the November 10, 2010 Memorandum did not fully set forth the commission plan or employment agreement between the parties. (Answer ¶14.) First Housing's motion for summary judgment and supporting materials alter this position. The Busansky Declaration indicates that the November 10, 2010 Memorandum, which was understood as a negotiated condition of McGovern's employment, was accepted by First Housing and constitutes the parties' entire agreement. Busansky explains:

> I calculated McGovern's commission in accordance with the Commission Plan set forth in my  October 26, 2010 offer letter (Exhibit A) as amended by McGovern in his November 10, 2010 memo to me ("amended offer letter") (Exhibit B). Both Exhibits A and B are true and accurate copies. Together those two documents comprised our entire agreement as to McGovern's compensation and expense reimbursement. I never had any conversations with McGovern nor made any promises to him, verbally or in writing, that differed from our written agreement.

(Busansky Declaration, ¶ 9. With regard to McGovern's breach of contract claim, the Court finds, as the parties indicate, that the Offer Letter and Memorandum govern the calculation of McGovern's commission; the Court further finds that First Housing has not pled and does not now allege that McGovern failed to perform under the terms of this agreement. Having satisfied the first two elements of a breach of contract suit, the Court turns to the question of whether First Housing has breached the terms of the agreement. *V & M Star Steel, supra* at 465.

Although the parties now agree that McGovern's 2012 Commission for the Woodward Garden project was completely governed by the Memorandum, each party seeks to alter the plain language of the terms reflected in the Memorandum. The Memorandum is expressly limited to "the following project financings. Woodward Garden Apartments, Midtown Detroit, Michigan (about $8.5 million, FHA 220 mortgage)" and "Sugar Hill Apartments/74 Garfield Apartments, Midtown Detroit, Michigan (about $6 million, FHA 220/221d mortgage)" Plaintiff, however, seeks to extend the provision that includes consulting fees among the revenue streams that generate his commission to include the Mayslake project. (Complaint ¶ 19.) Although the agreement also provides "in the instance where both financings (or other financings) close in the same fiscal year the commission calculation will escalate from the 20% level as is normally the case under the First Housing Commission Plan," the calculations on which McGovern bases his breach of contract claim include the 30% and 40% Commission rates, but do not demonstrate

that he has reached the necessary $450,001 and $650,001+ thresholds dictated by the Commission Plan reflected in the October 26, 2010 offer letter.

Similarly, although the Memorandum defines the calculation for commission applicable to the named projects:

> For these two financings, George McGovern's commission will begin at the $225,001 - $450,000/20% Commission Plan level. His commission for such deals will be based upon the gross amount of origination fees, including any consultant fees, and premium earned through the sale of GNMA securities for the transaction, less any salary, office expense, travel expense, and revenue paid to Forest City Capital Corporation as of the date of settlement.

(Defendant's Motion for Summary Judgment, Exhibit B.) First Housing seeks to include "trade custom" that would include legal fees among the items to be deducted prior to calculating McGovern's commission on the two projects. (Busansky Declaration, ¶ 11.)

Although First Housing identifies the Offer Letter and Memorandum as the entirety of the agreement between the parties, First Housing alleges that industry custom and practice should be incorporated in both, in the absence of any reference to custom in either writing. First Housing contends that McGovern has conceded that the deduction of legal fees was industry custom during his deposition. It is true that in the context of discussion McGovern's calculation of the commission owed him for the Luther Hills and Luther Woods deals, McGovern indicated that legal expenses would have been customarily "incurred" as part of the transaction. (McGovern Deposition, 172.) Later during the deposition, when discussing McGovern's attempt to negotiate a consulting relationship with First Housing, McGovern was directed to the following language in his proposal "Compensation earned by First Housing would be net of any Lender legal costs customarily incurred." (McGovern Deposition, 186.) McGovern explained in the deposition that his intent was to reflect industry custom as part of the consulting agreement,

13

and that if it was customary to deduct legal fees before calculating commission, he would accept that for his compensation as consultant. (McGovern Deposition, 187.)

This Court is required to first determine whether, as a matter of law the agreement is clear and unambiguous. *City of St. Marys, supra*, at 566. Where the "terms in an existing contract are not ambiguous, courts are constrained to apply the plain language of the contract." *Id.* "Contractual language is ambiguous 'only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations.'" *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008), quoting *Covington v. Lucas*, 151 Ohio App.3d 409, 784 N.E.2d 186, 190 (2003). Nothing in the Memorandum suggests ambiguity. The words themselves are common, as such they "are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Savedoff*, at 764, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, 150.

The language of the Memorandum sets forth a straightforward calculation for commission, it is limited to two projects, and accounts for expenses; nothing in the provision is manifestly absurd. The overall content of the instrument is an offer of employment, the acceptance of which was conditioned on more favorable terms of commission for financing projects the prospective employee had already developed. The content of the document readily suggests that First Housing was interested in both McGovern's FHA Financing experience and the possibility he could deliver two multi-million dollar financing projects immediately. The idea that Fist Housing was willing to deviate from its standard commission plan and negotiate more favorable terms of compensation for these projects is entirely consistent with the content of the documents. Similarly, McGovern was clearly interested in the offer of employment, but

14

wished to secure enhanced commission terms for work he had begun prior to employment. Limiting the more favorable terms to projects he had already developed is reasonable in the context – as is applying First Housing's standard Commission Plan to future projects which, unlike the named projects, he would develop while on salary with expenses reimbursed.

Where, as here, the content of an agreement is unambiguous, courts "may not use extrinsic evidence to create an ambiguity; rather an ambiguity must be patent, i.e., apparent on the face of the contract." *Savedoff* at 763, citing *Covington*. Thus, First Housing's belief that industry custom should be read into the Memorandum and allow legal fees to be included with the named items to be deducted from the gross fees generated requires the Court to ignore the plain meaning of the contract through the use of extrinsic evidence.  Not only is the use of extrinsic evidence inappropriate in this instance, it would prevent the Court from construing the contract as a whole – introducing industry custom would negate the preclusive effect of the specific commission language in the Memorandum.  *Savedoff*, at 763, quoting *Tri-State Group, Inc. v. Ohio Edison Co.*, 151 Ohio App.3d 1, 782 N.E.2d 1240 ("a contract must be construed as a whole").  Thus, the amendment to the compensation agreement negotiated by the parties does not include a deduction for legal fees applicable to the Woodward Garden and Sugar Hill projects.

The remainder of McGovern's breach of contract claims have no basis in the Offer Letter or Memorandum. The Memorandum differs from the Commission Plan stated in the Offer Letter in three important ways, (1) the calculation of commission begins with the first dollar generated; (2) the calculation of commission is defined to include "the gross amount of origination fees, including any consultant fees, and premium earned through the sale of GNMA securities for the transaction"; and (3) the Memorandum defines the deductions to be taken from as "less any

salary, office expense, travel expense, and revenue paid to Forest City Capital Corporation as of the date of settlement." (Defendant's Motion for Summary Judgment, Exhibit B.) This specificity is in contrast to the Commission Plan, which is silent as to the calculation involved in generating commission, and separates Trade Premiums earned on GNMA Securities from the escalating commission scale, to instead impose a flat 20% trade premium commission rate with an annual cap of $200,000.00. The escalating commission rate that applies to non-trade Premium Commissions is presented simply: "Quarterly payout upon achievement of $225,000 annual threshold in origination fees, and/or trade premiums generated through sale or placement of loans generated by you;" and sets thresholds for increased rates of commission – 225,001 for 20%; $450,001 for 30%; and $650,001+ for 40%. As stated above, McGovern was entitled to commission for the consulting fees generated in the Woodward Garden and Sugar Hill projects only. McGovern has not identified any basis in fact or law that supports his claim to consulting fees for other projects, or his claims that he is owed commission at the 30 or 40% rates. McGovern does not dispute the revenue numbers used to calculate his commissions, only the deductions taken from them and the rates of calculation. Nothing in the information provided by First Housing, or by McGovern, indicates that he generated revenue reaching the thresholds necessary to increase his commission rate.

To the extent that legal fees were included in the deductions from the Luther Hills and Luther Woods projects, those projects are subject to the Commission Plan, not the Memorandum, and the Plan, unlike the Memorandum, is silent as to the calculation used to determine commission. This omission, however, does not create ambiguity. *Savedoff* at 764. Under Ohio law, "[i]f a contract is silent, as opposed to ambiguous, with respect to a particular matter" the parties "to a contract are required to use good faith to fill the gap of a silent contract." *Savedoff*

at 764, (citations omitted). "What the duty of good faith consists of depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties." *Id.* (citation omitted.) In this instance, according to First Housing and, to a degree, McGovern, industry custom represents the good faith solution that provides the calculation remedying the absence of specific provisions in the Commission Plan.

For these reasons, the Court finds that First Housing is in breach of the Memorandum as to payment of commission for Woodward Garden. First Housing's motion for summary judgment is therefore DENIED IN PART as to commission paid on Woodward Garden. McGovern's remaining claims regarding his 2012 commission are wholly without merit. First Housing's motion for summary judgment is therefore GRANTED IN PART as to the commission paid on the remaining projects in 2012.

### b)  Promissory Estoppel, Quasi-Contract, and Unjust Enrichment

McGovern argues promissory estoppel, quasi-contract, and unjust enrichment as alternatives to his breach of contract claim. He also makes a separate claim for commission that would have accrued on projects he was involved in, but that did not conclude, or generated additional income, after he was no longer employed by First Housing.

With regard to McGovern's additional claims under the terms of the Commission Plan and Amendment, the Court has determined that an enforceable contract governs these allegations. In Ohio, "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel...." *O'Neill v. Kemper Ins. Companies*, 497 F.3d 578, 583 (6th Cir. 2007) (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181 (6th Cir.1996)). Similarly, "A claim for unjust enrichment is an equitable claim, and is based on a legal fiction where courts will imply a 'contract' as a matter of

17

law. See *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009). "Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another." *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir.2009). An implied-in-law, "quasi-contract," however, is neither necessary nor appropriate when an express contract governs the dispute between the parties. Accordingly, because the Court concludes, and the parties agree, that there was an enforceable express compensation agreement between McGovern and First Housing, the Court dismisses McGovern's promissory estoppel, quasi-contract, and unjust enrichment claims as they relate to the 2012 commission payments.

To the extent that McGovern makes a claim for commissions that would have been generated by financing projects in 2013 and beyond, after his employment with First Housing ended, there is no writing that entitles him to such payments. Few state or federal courts in Ohio have been called upon to evaluate a claim for post-employment commission, those courts that have are united in finding that in Ohio "[a]bsent a contract for future commissions, an employee is not entitled to post-employment commissions on previously generated business" *Ragen v. Hancor, Inc.*, No. 3:08 CV 1022, 2010 WL 301761, at *5 (N.D. Ohio Jan. 19, 2010), citing *International Total Services, Inc. v. Glubiak*, 1998 WL 57123 at *2 (Ohio App. 8 Dist. Feb.12, 1998). Plaintiff has not pled the elements of a valid contract for post-termination commissions. The contract between the parties provides only for commissions while McGovern was employed by First Housing, as an at will employee who could be terminated, or leave employment, at any time. There is no allegation of an independent oral contract for post-termination commissions. Under these circumstances, the fact that the parties agreed to a commission schedule does not

constitute, "as a matter of law, a promise to pay commissions in perpetuity." *Weiper v. W.A. Hill & Assoc.*, 104 Ohio App.3d 250, 258, 661 N.E.2d 796 (Ohio App. 1 Dist.1995). Absent a written contract contemplating the payment of commission post-termination there is no legal basis for McGovern's claim nor is there an issue of material fact that could be resolved to entitle Plaintiff to commission for projects that concluded or generated income after his employment ended. Accordingly, First Housing's motion for summary judgment as to McGovern second, third, and fourth claims for promissory estoppel, quasi-contract, and unjust enrichment, is GRANTED, the claims are DISMISSED.

### c) Declaratory Judgment

McGovern seeks judgment determining the legal rights of the parties to future income from the by the "Mayslake Center II Apartments" project. First Housing has produced a letter dated May 8, 2013, which terminated First Housing's role as lender in the Mayslake Project. (Summary Judgment, Exhibit X.)  In the absence of any legal basis for McGovern's claim to commission on future income generated by First Housing, as stated above, and due to the fact that First Housing has ended its involvement in the Mayslake project, there is no outstanding issue of material fact that could be resolved in McGovern's favor resulting in a right to income from Mayslake.  Accordingly, First Housing's motion for summary judgment is GRANTED as to McGovern's Fifth Cause of Action, the claim is DISMISSED.

**IV.**     **CONCLUSION**

First Housing's motion for summary judgment is DENIED IN PART AND GRANTED IN PART. Judgment is hereby entered in favor of First Housing on counts two through five of the complaint, partial judgment is to First Housing on count one of the complaint. Counts two, three, four, and five of the complaint are DISMISSED, count one is DISMISSED IN PART.

IT IS SO ORDERED.

 _John R. Adams_
JUDGE JOHN R. ADAMS
UNITED STATES DISTRICT COURT

**DATED**: SEPTEMBER 30, 2015